No. 2956.

PRIMUS HAMILTON *v.* THE STATE.

1. BURGLARY.—INDICTMENT is sufficient to charge the burglary of a railway car, if it alleges that the said car was occupied and controlled by a certain named person, and that the burglarious entry was made with the fraudulent intent to take, etc., otherwise alleging all the elements of theft. The ownership of the car need not be alleged. Evidence that other cars of the same general description were burglarized would not vitiate the indictment for uncertainty, but might require the State to elect the one upon which a conviction would be sought. See the opinion for the charging part of an indictment *held* sufficient to charge the burglary of a railway car.

2. SAME—ACCOMPLICE TESTIMONY—CHARGE OF THE COURT.—If the evidence adduced on a criminal trial tends to raise the issue of the complicity of a State's witness in the commission of the offense, it becomes the duty of the trial court, independent of the strength or weakness of such evidence, to instruct the jury upon the law applicable to accomplice testimony. The proof in this case raising such issue, the trial court erred primarily in omitting to instruct the jury upon it, and again in refusing the special charge requested by the defense to supply such omission.

APPEAL from the District Court of Fannin. Tried below before W. A. Evans, Esq., Special Judge.

This conviction was for the burglary of a railway car, and the penalty assessed was a term of two years in the penitentiary.

J. M. Booth was the first witness for the State. He testified that he lived at Bonham, Fannin county, Texas, and was the general agent at that place of the Texas & Pacific Railway company. As such agent he had the care and control of all the freight cars, and the contents of the same, of the said company while in the depot yards of the said company in the said town of Bonham. Such cars and their contents, from the time they are placed in the said yards until they are delivered to the conductors of trains for transportation, are in the possession of the witness, and he was responsible for their safe custody. Witness had a day and a night clerk—Mr. J. R. McKinney being night clerk. Each of these clerks worked under the direction and control of the witness. On the night of July 26, 1888, three of the freight cars in the depot yards of the company in Bonham, and then in the possession and under the control of the witness, were broken open. Two of those cars contained general merchandise, and the other was loaded with lumber. The said cars were to have been forwarded to western points on the morning of July 27, 1888. The said cars of merchandise had been at Bonham, the end of a division, in the possession and custody of the witness about twenty-four hours, and the car of lumber had been in his possession from six to eight hours. Each of the said three cars was closed and sealed. The witness did not authorize the defendant nor any other person to break into the said cars, or either of them, on that night, nor at any other time; nor to take any goods or article whatever from either of said cars. Each of the said cars was closed by sliding doors and fastened with leaden seals through each of which a wire was thrust and clamped. The conductor of the train that was to take the three cars forward on the morning of the twenty-seventh refused to take them because of the broken seals, and the fact that they had been entered on the previous night.

On his cross examination, the witness said that he did not know of his own knowledge that the said cars were broken open on the night of the twenty-sixth. The witness was em-

ployed by the receivers of the Texas & Pacific Railway company as their agent at Bonham, and executed his bond to said company for the faithful performance of his duties as such agent. He was not in the actual occupancy of the said three cars, but they were in his personal care and custody. Witness was authorized to enter sealed cars at will, take out or put in freight as necessity required, and to make any changes in the cargoes he thought proper. On such occasions he generally made memoranda of changes, and reported the same when required.

J. R. McKinney was the next witness ror the State. He testified that he was the night clerk at the depot yards of the Texas & Pacific Railway company at Bonham. He was employed by and was under the direction and control of General Agent Booth. He was so employed on the night of July 26, 1888. The three freight cars mentioned and described by the witness Booth were broken open and entered on the said night—or, rather, between four and five o'clock of the next morning. Day broke on the morning of July 27, 1888, about 5 o'clock, and it was just before day break that the witness discovered that the said cars had been recently broken open. The seals were removed and the said cars had been entered. When witness discovered that the said cars had been broken open and entered, he went into them and discovered that in one of the merchandise cars a box of candy had been opened and about two pounds of candy taken out. The said cars were to go forward on the next morning, but because of the breaking the conductor of the train refused to take them. The car of lumber was bound to Houston, and the two merchandise cars were loaded with local freight for points west of Bonham. Witness identified one of the seals exhibited to him as that which was broken from the car of lumber, but could not identify the second seal, which showed that it was put on a car at St. Louis, Missouri. The witness was present when defendant and four negroes were arrested for the burglary of the cars. They were arrested just before day light. They were in cars on the train to which the three burglarized cars were attached, and, when summoned by the officers to come out of the cars and surrender, they jumped from the cars on the side opposite from the officers and fled toward some neighboring brush, but were pursued, overtaken and arrested by the officers. Thereafter, about sun rise, two other negroes— the State witnesses, Amos Willis and Sim Reed—were arrested.

by Knox Smith. The said Willis and Reed were not with defendant and his four associates when they were arrested. On his cross examination the witness said that the car from which defendant and his four associates sprang just before their arrest was an open, empty box car, and was not one of the burglarized cars. It was, however, a part of the train to which the burglarized cars belonged, and which train was on the eve of starting west when the burglary was discovered and the said parties arrested.

T. A. Orr testified, for the State, that he was a brakeman on the freight train that went west from Bonham on the morning of July 27, 1888. He saw three cars that were burglarized a short time before the train started, and entered each of them. He saw in one of the merchandise cars a bucket of candy that had been neatly burst open, and from which two or three pounds of candy had been taken. The three said cars were to have gone forward on the said train, which left at day light— a few minutes past five o'clock—but the conductor of the train cut them out and refused to take them on, and left them in the yard. Just before the train started five negroes sprang from a box car and fled towards the brush. They were pursued and arrested by officers. When witness went into the merchandise cars he found a white man in one of them and no body else.

Cross examined, the witness said that the box car from which the five negroes sprang, just before their arrest, was not one of the burglarized cars. It was open but had not been broken open. It was a common thing to find tramps in open cars trying to "steal" rides. The white man mentioned by the witness was not in the car in which the broken bucket of candy was stored. He was hiding behind a barrel when witness found him. That white man, however, had very near two pounds of candy in his pockets, which looked very like the candy that was in the bucket in the other car. Witness turned that white man over to Gates. The cars were broken in on the south side.

Hode Gates testified, for the State, that he was the night watchman in Bonham, Texas, and was one of the officers who arrested the defendant and four other negroes on the morning of July 27, 1888, upon the charge of burglarizing the cars of the Texas & Pacific Railway company. Witness found the five negroes in an open box car of the train that was to leave that morning. He ordered them to surrender, when they

jumped from the car and fled towards the brush. Witness and Hamilton pursued and arrested four of them in a bunch, and the defendant by himself. Defendant ran into some high weeds and attempted to secrete himself, but was captured by Hamilton. About an hour later two other negroes—the State's witnesses, Willis and Reed—were arrested. They were not with the defendant and his four associates when they jumped from the car. All of the said negroes, including Willis and Reed, were strangers in Bonham. A white man was arrested in one of the cars, but, as the witness was informed, he proved to be a lunatic. On his cross examination, the witness said that Orr delivered the white man to him just before the discovery of the negroes in the box car. Witness found a pound or two of candy in the pockets of the white man, which he compared to the candy in the broken bucket. He found it to compare exactly with said candy. After securing the defendant and his four associates, the witness took them to the calaboose, about a quarter of a mile distant, and locked them up. A short while later the witness started back to the depot, and midway between that point and town, he met Smith with the negroes Willis and Reed in charge. Smith delivered the said parties to witness, and witness took them to the calaboose and locked them up with the others.

W. B. Hamilton, city marshal of Bonham, testified, for the State, that he arrested the defendant and four other negroes, near the depot in Bonham, a short while before day, on the morning of July 27, 1888. The said negroes were found in an open box car of the Texas & Pacific Railway Company, and, when ordered to come out and surrender, they sprang from the said car and fled towards the brush. Defendant left the other four and ran into some weeds, about one hundred yards from the depot, where he laid down. He had on a pair of new red leather slippers when arrested. The leaden car seals now exhibited to witness, being the same that were shown to the witness McKinney, were identified by witness as the seals he found under the calaboose window after the defendant and the other negroes, including Willis and Reed, were placed in the calaboose. Somebody informed witness that the defendant threw some seals out of the window, and the witness thereupon went outside and found them on the ground under the said window. Willis and Reed were placed in jail some time after the first five were. A white man, who proved to be a lunatic, was also

placed in jail. All of the said seven negroes were strangers in Bonham. On his cross examination the witness said that all of the negroes and the white man were arraigned before the mayor of Bonham on the said morning, and all of them pleaded guilty to trespass upon the cars. They were all fined and turned over to the witness. The white man proving to be a lunatic, witness turned him over to the county authorities. He put the negroes to work on the streets of Bonham for eight or nine days, when, having worked out their fines and costs, he turned them over to the sheriff of Fannin county. It was the white lunatic who told the witness about the defendant throwing the car seals out of the calaboose window.

Amos Willis testified, for the State, that he lived in Palestine, Texas. He knew the defendant and Sim Reed, and the other four negroes who were arrested for the burglary of the Texas & Pacific cars on the night of July 26, 1888. The said negroes and witness came to Bonham together on the night of the burglary, "beating" their way to that point from Paris, in Lamar county, on a freight train. Some of the said negroes lived at Shreveport, and some at Texarkana. All of them, including witness, had been recently at work near Blossom Prairie, east of Paris, on a tie train. All were paid off on July 25. The defendant and others gambled off their wages, except a small amount they spent in Blossom Prairie for oysters. Witness won some of their money, playing dice. Witness and Reed came to Bonham from Blossom Prairie, expecting to get work. The others, without grub or money, embarked at Blossom Prairie to beat their way to Kansas City, Missouri. The party reached Bonham between two and three o'clock on the morning of the twenty-seventh. Upon reaching Bonham, the witness suggested going to bed and to sleep, but the defendant said that he was hungry, and intended to get something to eat. Witness told him that he had no money to buy anything with. Defendant replied that he would break open one of the cars and get some food. Witness replied that he would not engage in that work. All the other negroes except witness and Reed agreed to defendant's proposition to break into a car. The party then walked up the track to one of the cars, which the defendant opened with a stick. He and four others then went into the car. After standing near the car about two minutes, the witness and Reed went back towards the round house. Reed laid down on a pile of ties, and the witness on some

weeds, and went to sleep. After defendant and his four associates got into the car, the witness heard them pounding on something, and it sounded to witness like they were trying to break into a box. Reed and witness got up next morning, and were nearing town when they met Knox Smith, who arrested them and turned them over to Watchman Gates, who in turn put them in the calaboose, where they found the defendant and the other four negroes. Soon after witness and Reed were put into the calaboose, he saw the defendant take some car seals from his slippers and throw them out of the calaboose window. Soon afterwards, he heard a white man then in the calaboose tell Mr. Hamilton about defendant throwing the seals out of the window.

Cross examined, the witness said that he walked from Blossom Prairie to Paris, but the others beat their way on a freight train. On reaching Paris the witness met the parties, and he and Reed got something to eat by "splicing" their funds. The others, being without money, got nothing to eat in Paris. Witness knew they had no money, because he and Reed, on the morning before, won what little the others had left of their wages. The parties left Paris together on a freight train, about dark, and got to Bonham between two and three o'clock, the said train stopping at one point en route to take on some ties. The witness did not see but one car broken open, and that was broken on the north side. The entire party were fined by the mayor and were put to work on the streets. Witness supposed they were fined for beating their way on the railroad. After being worked on the streets for several days, the several parties were arrested upon the charge of breaking into the cars. When they had remained in jail under that charge ten or twelve days, witness and Reed got a prisoner named Bill English to write a note for them to 'Squire Lyday, requesting him to visit them at the jail, and expressing their desire to tell all about the car transaction. They were moved to do that by their desire to get out of jail and their consciousness that they were innocent of the charge of car breaking and burglary. Witness and Reed then turned State's witnesses, and were relieved of the charge against them, but were held as State's witnesses, and testified on the examining trial of the defendant and his four confederates.

The State closed.

Justice of the Peace E. H. Lyday testified, for the defense, that the defendant and six other negroes, including Amos Willis and Sim Reed, were brought before him on a charge of car breaking and burglary. Willis and Reed wrote witness from the jail that they wanted to testify for the State as to the facts of the car breaking. They were brought before witness, who dismissed the cases against them, so that they might testify against the others.

On cross examination, the witness said that the cases against Willis and Reed were dismissed upon the voluntary motion of the district attorney, who stated in support of his motion that he had no testimony to support the charge as against them. He also disclaimed at the time that he had made any agreement with the said Willis and Reed to dismiss their cases in consideration of their testifying in behalf of the State. Willis and Reed were then released upon the street, and were never indicted.

E. L. Agnew, mayor of Bonham, testified, for the defense, that he remembered the arrest, in July, 1888, of seven negroes and a white man for trespass on the cars. They were brought before him for trial. No evidence was introduced. Witness merely asked the crowd if they pleaded guilty, and fined them. Witness took down the name of each negro, but could not now distinguish one from another.

*Taylor & Baldwin,* for the appellant: We insist that the motion in arrest of judgment should have been sustained, because, 1, the *intent* being of the essence of the offense of burglary, and a fact which is to be proved by the State, it should be expressly alleged in an indictment for that offense. This indictment fails to charge that the burglarious entry was made with the intent to commit a felony or theft. (Willson's Crim. Stat., sec. 1960; Code Crim. Proc., art. 423; Willson's Crim. Forms, p. 201, note; Reeves v. The State, 7 Texas Ct. App., 276; Black v. The State, 18 Texas Ct. App., 127.)

2. Everything should be stated in an indictment which it is necessary to prove. This indictment charges the burglary of a railroad car, yet it fails to allege to what railroad company the said car belonged, and on what railroad the said offense was committed. (Willson's Crim. Stats., sec. 1958; Code Crim. Proc., art. 421; Reeves v. The State, supra; Black v. The State, supra; Kerry v. The State, 17 Texas Ct. App., 184–188.)

3. The certainty required in an indictment is such as will

enable the defendant to plead the judgment that may be rendered upon it in bar of any prosecution for the same offense. This indictment fails to describe the car burglarized by the defendant. (Code Crim. Proc., art. 422; Willson's Crim. Stats., sec. 1959; Willson's Crim. Forms, No. 465.)

We therefore submit that the indictment is not sufficient in law to charge a railroad car burglary, and that the description of the car is not sufficient to notify the defendant which one of said cars he is accused of breaking, nor does the testimony sufficiently identify said car to enable him to plead his conviction in another trial for the same offense. There were three cars broken; the breaking of each car was a distinct and separate offense; and if the defendant broke all three of said cars he is liable to be prosecuted for three distinct and separate burglaries. Now suppose the defendant is indicted for the burglary of the other two cars. Could the court say from the indictment filed against him herein which one of said cars he was tried for breaking? Or could the court, from the testimony, say that he was in fact tried for the breaking of either of said cars, the indictment not giving the number nor any other description of said car, and the testimony of Orr and Brown showing that all three of said cars were broken on the south side, while the testimony of Willis shows that the car he saw the defendant break was broken on the north side.

The court erred in refusing to give the special charge asked by defendant on accomplice testimony. The charge asked reads as follows, to wit: "A conviction can not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense. An accomplice is a person who, either as a principal or an accessory, is connected with the crime by unlawful act or omission on his part transpiring either before, at the time of or after the actual commission of the crime, and whether he be present and participating in its commission or not."

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. The charging part of the indictment is as follows: "That Primus Hamilton, on or about the eighth day of August in the year of our Lord, one thousand eight hundred

and eighty-eight, in the county of Fannin, and State of Texas, did then and there unlawfully at night, by force, threats and fraud, break and enter a railroad car, there situate and occupied and controlled by J. M. Booth, without the consent of the said J. M. Booth, and with the intent then and there fraudulently to take from said car corporeal personal property therein being and belonging to the said J. M. Booth, from the possession of the said J. M. Booth, without his consent, and with the intent to deprive the said J. M. Booth, the owner of said corporeal personal property, of the value thereof, and to appropriate the same to the use and benefit of him the said Primus Hamilton." Exceptions to the indictment were made and overruled, and a motion in arrest of judgment based upon supposed defects in the indictment was also made and overruled, and these rulings are claimed by the defendant to be erroneous.

The first objection made by defendant to the indictment is, that it does not allege expressly that the burglarious entry was made with the intent to commit a felony or theft. This objection is certainly not sustained by the record, as it will be seen by reference to the indictment above quoted that it directly and plainly charges that the entry was made with the intent to fraudulently take, etc., setting out all the elements of theft. In this respect the indictment is in the usual, approved form.

A second objection urged to the indictment is that it fails to allege to what railroad company said car belonged, and on what railroad said offense was committed; and in connection with this may be considered the third and last objection, which is that the indictment fails to designate or describe the car alleged to have been burglarized. We are of the opinion that these objections are not valid ones, and that the indictment is sufficient. We can see no reason why an indictment for burglarizing a railroad car should be more specific and certain than one for burglarizing a house. In the case of a house it has been held that an indictment which described the house entered as "a certain house then and there occupied and controlled by" a named person, was a sufficient designation of the house. (Sullivan v. The State, 13 Texas Ct. App., 462.)

It is not essential to allege or prove the ownership of the house or car, as it is immaterial who owned the same at the time of the entry. If it was occupied or controlled by the person named in the indictment, it matters not whether it belonged

to him or some other person, or to a corporation. If the evidence shows that more houses, or more cars, than one, of the same general description given in the indictment, were burglarized, this does not vitiate the indictment for uncertainty, but the State might be forced to elect which one of the burglaries she would rely upon for conviction, and there would then be no difficulty in sustaining a plea of former acquittal or conviction in case of a subsequent prosecution for the same burglary. We are of the opinion that the indictment is in all respects a valid one.

Amos Willis was a material witness, who testified in behalf of the State on the trial. His testimony is important, and, if credited, leaves no reasonable doubt of the defendant's guilt of the burglary charged. Without his testimony the conviction would not be warranted by the evidence, as it is presented to us. It was claimed by the defendant on the trial, and is claimed here, that said witness was an accomplice in the burglary. While the evidence may not, and in our opinion does not, prove conclusively that said witness was an accomplice in the crime, it nevertheless tends to show his complicity in it, and fairly raises that issue. Facts were in proof from which the jury might reasonably conclude that said witness was a *particeps criminis*, notwithstanding his positive assertion to the contrary. The court having failed to instruct the jury in relation to accomplice testimony, the defendant requested a correct instruction which would have supplied the omission, but the requested instruction was refused upon the ground that the evidence did not call for or warrant it, and the defendant excepted, and reserved his exception by proper bill. This failure and refusal of the court to submit to the jury, under proper instructions, the status of said witness and the rules applicable to his testimony in case the jury should believe him to be an accomplice, was material error, which would vitiate the conviction even had it not been excepted to; and because of this error alone the judgment is reversed and the cause is remanded. (Boren v. The State, 23 Texas Ct. App., 28.)

*Reversed and remanded.*